IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

VALARIE A. HIBBARD                                                                                          PLAINTIFF

v.                                         Civil No. 10-2175

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                                           DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Valarie Hibbard, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.     Procedural Background:**

The plaintiff filed her applications for DIB and SSI on October 14, 2008, alleging an onset date of April 6, 2007, due to depression, arthritis, shortness of breath due to chronic obstructive pulmonary disease ("COPD"), and heart problems. Tr. 143-150, 182, 237-238. Her applications were initially denied and that denial was upheld upon reconsideration. Tr. 68-77, 81-88. Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on October 5, 2009. Tr. 31-67. Plaintiff was present and represented by counsel.

At this time, plaintiff was 45 years of age and possessed a high school diploma. Tr. 36. She had past relevant work ("PRW") experience as quality assurance inspector, cake decorator, and deli worker. Tr. 36, 53-54, 56, 60, 183, 188, 207.

On April 2, 2010, the ALJ found that plaintiff's COPD, obesity, arthritis, and depression were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 13-15. After partially discrediting plaintiff's subjective complaints, the ALJ

determined that plaintiff retained the residual functional capacity to perform unskilled light work involving limited interaction with others; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and, no concentrated exposure to temperature, humidity, and airborne irritants. Tr. 15-17. With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a sorter, hand packager/inspector, and inspector. Tr. 18-19.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on October 15, 2010. Tr. 1-3. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 8, 9.

## II. Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d

1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his/her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his/her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his/her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III. Evidence Presented:

Records dated prior to the alleged onset date reveal a history of treatment for hypertension, gastric reflux, chest pain, sinubronchitis, polyarthralgia, borderline cardiomegaly, global paresthesia likely due to anxiety, situational depression, and anxiety. Tr. 239-264, 341, 348, 393-400. A nuclear stress scan conducted in September 2006 was normal and revealed an ejection fraction rate of 56%[1]. Tr. 246-247.

---

[1] The listings require a left ventricular ejection fraction of thirty percent or less and a cardiologist's conclusion that the performance of an exercise test will present a significant risk to the individual. 20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04. It is clear Plaintiff does not meet these requirements, given her ejection fraction rate and the fact that she has undergone exercise stress tests.

On August 7, 2007, Plaintiff was hospitalized for two days due to chest pain. Tr. 343-347, 349-384. Plaintiff stated that the chest pain began while she was working. She described it as left-sided, starting in the clavicle and going to the central area of her chest. The pain was sharp, and she rated it as a 10 on a 10-point scale. It increased with movement, responded to Nitroglycerin, and was associated with nausea and diaphoresis. Overall, Plaintiff took three Nitroglycerin for three episodes of chest pain. She also developed severe shortness of breath, which was severe, and rendered her unable to talk or move. As a result, her family transported her to the ER. Upon admission, Plaintiff also reported some joint pain without muscle weakness or neurological deficits, hematological symptoms, or endocrine compromise. A physical examination was non-contributory; her laboratory findings were normal; chest x-rays showed over penetration, but no consolidations, infiltrations, or pleural effusion; and, an EKG showed sinus rhythm with a normal axis and no changes in her previous EKGs. Plaintiff was admitted to ICU to rule out the possibility of a myocardial infarction. The following day, Plaintiff underwent a stress test and myocardial perfusion imaging ("MPI"), both of which were normal and revealed an ejection fraction rate of 69%. She was discharged home with prescriptions for a beta-blocker and aspirin. The Imdur was discontinued, but all other home medications were continued. Plaintiff was to follow-up with her primary care physician and cardiology in one week. Her discharge diagnoses were resolved chest pain, osteoarthritis, hypertension, COPD, and depression. Dr. Matthew Steed released her to return to activity as tolerated, and directed her to increase her walking to thirty minutes per day. Tr. 343-347.

On September 20, 2007, Plaintiff complained that her lungs were "killing" her. Tr. 392. She was fatigued, dizzy, complained of chest pain, and exhibited a dry cough. The doctor also noted a flat affect with bilateral shallow breaths due to splinting. The doctor diagnosed her with noncardiac chest pain and COPD. He prescribed Cipro, administered a Decadron injection, and changed her from Albuterol to Combivent. Tr. 392.

On November 14, 2007, Plaintiff sought emergency treatment for symptoms related to a COPD flare and chest pain of uncertain causes. Tr. 265-278, 340, 385-388. She presented with complaints regarding her lungs and her knees. Faint wheezing; a moderate, productive cough with yellow sputum; and, slightly decreased air movement were noted on examination. Plaintiff was prescribed Prednisone, Celebrex, and Azithromycin to treat her COPD exacerbation. She was also advised to continue using the Albuterol metered dose inhaler. Tr. 265-278.

On November 27, 2007, Plaintiff complained of coronary spasms, hypertension, a dry cough, orthopnea, snoring, epigastric pain, and diarrhea. Tr. 420-422. An examination revealed oral thrush. Dr. Arturo Meade, a pulmonologist, diagnosed her with COPD and oral thrush. Smoking cessation and Chantrix were prescribed, as well as Diflucan. Tr. 420-422.

On April 2, 2008, Plaintiff presented in the ER with complaints of numerous episodes of chest pain. Tr. 280-318, 470-476. Her most recent experience occurred approximately four hours prior, after going for a walk. She experienced chest pain that radiated down her left arm and into her jaw, along with nausea and diaphoresis. The pain was relieved via two sublingual Nitroglycerine. Plaintiff denied shortness of breath and dyspnea. An examination revealed a regular rate and rhythm with no appreciable murmur, rubs or gallops. Her mood and affect were both normal, and her remote and short-term memory were intact. Laboratory testing also revealed a blood count within normal limits and a negative triage panel. Because she had several risk factors for coronary artery disease, Plaintiff was admitted for observation on telemetry to rule out acute myocardial infarction. Repeat EKG's revealed sinus bradycardia, but were otherwise normal. A nuclear stress test was attempted, but Plaintiff reported fatigue and chest pain at stage II. However, it is noted that the test results were normal for the work level. Myocardial perfusion imaging showed no EKG changes to suggest ischemia with exercise stress testing at a suboptimal target heart rate, normal perfusion at suboptimal heart rate, a normal gated SPECT study, and an ejection fraction rate of 57%. Chest x-rays were also unremarkable, showing no acute

5

cardiopulmonary disease. Standard medical therapy and Statin therapy were instituted. Plaintiff was diagnosed with COPD, obesity, and chest pain. Smoking cessation was strongly advised, as were weight loss and exercise. Tr. 280-318.

On April 10, 2008, Plaintiff indicated that she had recently been in the hospital due to chest pain and was placed on Xanax. The doctor at Cornerstone Clinic noted that she was anxious, depressed, and complained of insomnia. An examination revealed tender bilateral costochondral joints, tender subspinale and intraspinal muscles, and muscle spasms. However, range of motion was noted to be within normal limits. Plaintiff was diagnosed with chronic, non-cardiac chest pain and acute left shoulder pain. She was prescribed Klonopin, range of motion exercises, and a trial of Trazadone.

On April 15, 2008, Plaintiff continued to experience difficulties with her COPD. Tr. 418-419. She complained of chest tightening, cough, and cold dry sweats. Plaintiff also stated that she was unable to stop smoking three packages of cigarettes per day. Dr. Meade diagnosed Plaintiff with a restrictive impairment secondary to obesity and COPD. She was directed to stop smoking. Tr. 418-419. Chest x-rays were normal. Tr. 426. Further, pulmonary function tests revealed a moderate restrictive ventilatory defect, normal diffusion capacity, and no significant change post-bronchodilator therapy. Tr. 427-430.

On May 10, 2008, Plaintiff was again treated for a COPD flare. Tr. 319-339, 459-468. She reported difficulty breathing, a non-productive cough, and a low grade fever. Some bilateral diminished breath sounds and wheezing were noted. Her primary care physician had called in prescriptions for Dexamethasone and Bactrim DS. Following the administration of SoluMedrol and two updraft treatments, Plaintiff was released home with a prescription for an Atrovent inhaler. Tr. 319-339.

On September 4, 2008, Plaintiff presented at the Cornerstone Clinic to have paperwork completed by the doctor. Tr. 390. Plaintiff was diagnosed with hypertension and COPD. She was given prescriptions for Effexor XR, Nexium, and Cozaar. Tr. 390.

On October 10, 2008, Plaintiff complained of symptoms related to her arthritis. Tr. 389. The doctor at Cornerstone Clinic diagnosed her with chronic polyarthralgia without joint effusion and no signs of synovitis. The doctor advised her to resume Lortab. He noted that she had low motivation to quit smoking, exercise, or lose weight. She was also directed not to take more than two Celebrex daily, to apply heat to the affect areas, and to perform stretching exercises. Tr. 389.

On November 4, 2008, Plaintiff complained of lung restrictions related to her COPD. Tr 415-417. Specifically, she reported difficulties with congestion, shortness of breath, wheezing, a sore throat, and green thick sputum. Expiratory wheezing was noted on examination. The doctor also noted that she was continuing to smoke three packages of cigarettes per day. He diagnosed Plaintiff with COPD exacerbation, and bronchitis. Azithromycin was prescribed, and Plaintiff was directed to stop smoking. Tr. 415-417.

On December 18, 2008, Plaintiff sought treatment for a sinus infection. Tr. 402, 480. She was diagnosed with acute sinusitis, COPD, hypertension, anxiety, and depression. The doctor prescribed Mucinex D and Cipro. He also administered a Decadron injection. Tr. 402.

On January 12, 2009, Plaintiff followed-up concerning her depression and anxiety. Tr. 401, 479. She indicated that her symptoms had worsened, as she had experienced many family deaths. Plaintiff also stated that her arthralgia had worsened since stopping Celebrex. She was diagnosed with depression with anxiety and chronic polyarthralgia. The doctor prescribed Lortab, Zoloft, Imdur, and one other medication that is illegible. Tr. 401.

On January 23, 2009, Andre Cole, a licensed counselor at Perspectives Behavioral Health Management conducted a diagnostic evaluation of Plaintiff. Tr. 504-522. She complained of depression and reported that her son had been stationed in Iraq. Plaintiff also reported being a slow learner and having irritable moods, decreased appetite, sleep disturbance, low energy, poor concentration and feelings of hopelessness. Anxiety and depression symptoms were endorsed, as were learning, cognition, and

memory impairments. Plaintiff was diagnosed with major depressive disorder. She was then referred for individual psychotherapy on an outpatient basis. Tr. 504-522.

In March 2009, Plaintiff was now reportedly taking Cymbalta and Klonopin. Tr. 478. She also indicated that her son was in Iraq, and she was stressed. The doctor noted that she was mildly anxious with slight tenderness in her left carotid artery. The doctor diagnosed her with chronic left carotidynia and major depressive disorder. A carotid doppler was ordered. Tr. 478.

On March 23, 2009, Plaintiff underwent an initial evaluation with Dr. Brent Witherington at Perspectives Behavioral Health Management. Tr. 499-503. He noted Plaintiff's reported diagnoses and her complaints of symptoms associated with major depressive disorder and anxiety. Plaintiff complained of symptoms of worthlessness and hopelessness, sleeping difficulties, anhedonia, difficulty concentrating, low energy, and a diminished appetite. At this time, Plaintiff denied a cough, hemoptysis, or severe shortness of breath, muscle tenderness or pain, paresthesias, and heat intolerance. Dr. Witherington noted no inappropriate behaviors, a normal flow of speech, no hallucinations or delusions, no apathy, no obsessions or compulsions, no suicidal thoughts or plans, full orientation, adequate memory and insight, and adequate judgment. Dr. Witherington prescribed Cymbalta to help with her depression and anxiety symptoms, and to possibly increase her energy level and decrease her alleged chronic pain. Although Plaintiff requested an increased dosage of Klonopin, the doctor denied her request. He found no indications for Klonopin, and indicated that once Cymbalta was titrated, he would begin tapering her off of the Klonopin. Dr. Witherington also encouraged intense therapy, recommended daily exercise and diet, and strongly recommended smoking cessation. He indicted that Plaintiff's global assessment of functioning score was 51. Tr. 499-503.

On March 26, 2009, a carotid duplex study was normal. Tr. 485. It revealed a normal real time ultrasound study of the carotid arteries of the neck, a normal doppler of the carotid arteries of the neck, and a normal doppler study of the vertebral arteries. Tr. 485.

On May 6, 2009, Plaintiff was again treated by Dr. Meade for COPD related symptoms. Tr. 454-456. Plaintiff continued to smoke one and a half packages of cigarettes per day, cough, and wheeze. A chest x-ray revealed stable cardiomegaly. Pericardial effusion or cardiomyopathy could not be excluded, and an echocardiogram was recommended for correlation. Dr. Meade diagnosed her with COPD and osteoarthritis. He prescribed Symbicort. Tr. 454-456.

On June 19, 2009, Plaintiff indicated that her depression was a little better. Tr. 487. Plaintiff reported getting more rest, and stated that her moods were a little better. However, she continued to have no desire to be around others or to be involved in activities. Plaintiff reported some increased anxiety, and continued low energy. Dr. Witherington noted her condition to be improved and assessed her with a GAF of 40. He then advised her to continue the Cymbalta, Abilify, and Klonopin, and encouraged her to continue therapy, perform daily exercises, and to stop smoking. Tr. 487.

In July 2009, Plaintiff returned to the Cornerstone Clinic for medication refills. Tr. 477. Plaintiff complained of back and neck pain, increased weight due to Abilify, edema in her hands and feet, and atypical chest pain. A flat affect and trace edema were noted on examination. The doctor diagnosed her with morbid obesity, chronic pain, COPD, hypertension, and major depressive disorder. Plaintiff was prescribed Lortab, Dyazide, and Phenergan. Tr. 477.

On July 15, 2009, Dr. Witherington composed a revised treatment plan for Plaintiff. Tr. 488-498. He diagnosed her with major depressive disorder and assessed her with a global assessment of functioning ("GAF") score of 35. He listed hobbies, habits, socialization skills, physical activity level, physical functioning, ability to develop friendships, and compliance with treatment as her weaknesses. Dr. Witherington also noted that she had been discharged from day treatment due to her not wanting to attend because she said she did not feel comfortable around other people. Her discharge statement indicated she had made minimal progress on knowledge, skills, and symptoms. At that time, Plaintiff had shown moderate improvements in the area of risk based behaviors and reported a significant decrease

9

in suicidal thoughts. Currently, Plaintiff complained of suicidal ideations, so it was noted that crisis services would be notified if Plaintiff's symptoms escalated and she refused to contract for safety. Tr. 488-498.

On July 31, 2009, Plaintiff presented for a medication management appointment with Dr. Witherington. Tr. 486. She indicated that she was doing about the same as she had been six weeks prior. Plaintiff denied any worsening of symptoms, stating that her son had returned home from Iraq. She also denied medication side effects, sleep difficulties, appetite changes, hallucinations, or suicidal thoughts. Plaintiff was not exercising as directed, but was participating in therapy, having last seen her therapist two weeks prior. She indicated that the worst part of her condition was knowing that her son would be going to Afghanistan in 2011. Dr. Witherington assessed Plaintiff's condition as stable and gave her a GAF score of 40. He then directed her to continue the Cymbalta, Abilify, and Klonopin, and encouraged her to continue therapy, perform daily exercises, be active in the community, and stop smoking. Tr. 486.

On August 19, 2009, Robin Sanders, a counselor, completed a mental medical source statement. Tr. 449-453. She indicated that Plaintiff had severe limitations regarding her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public; marked limitations in the areas of maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, being punctual, and accepting instructions, responding appropriately to criticism from supervisors, traveling in unfamiliar places, using public transportation, and setting realistic goals or making plans independently of others; and, moderate limitations in carrying out detailed instructions, making simple work related decisions, asking simple questions or requesting assistance, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in work

setting. Ms. Sanders opined that Plaintiff was psychologically unable to perform normal work-related tasks on a day-to-day basis in order to hold a job. Tr. 449-453.

## IV.   Discussion:

Plaintiff contends that the ALJ erred by failing to give the proper weight to the medical evidence; concluding Plaintiff could perform a range of light work; and, concluding Plaintiff could perform work as a sorter, hand packager/inspector, and inspector. We will begin our analysis with an evaluation of Plaintiff subjective complaints and the medical evidence of record.

### A.   Subjective Complaints:

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The

ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*   Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

### 1. Physical Limitations:

At the onset, we note that Plaintiff alleged disability due to heart problems, shortness of breath due to chronic obstructive pulmonary disease ("COPD"), obesity, and arthritis.  The ALJ concluded Plaintiff's cardiomegaly was non-severe.  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1521(a).  If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007).

In September 2006, a discharge summary revealed that Plaintiff's EKG had shown only *borderline* cardiomegaly with no evidence of congestive heart failure.  Both a stress test and an echocardiogram were negative. In August 2007, Plaintiff was again admitted after suffering chest pain, but her cardiac enzymes, an EKG, a stress test, and an MPI were normal.  Then, in April 2008, Plaintiff presented to the emergency room with chest pain, and her x-rays showed no evidence of acute disease process.  Further, an MPI was again normal.  Chest x-rays were repeated in May 2009, when Plaintiff experienced shortness of breath.  However, no changes were noted from the 2008 chest x-rays, and Plaintiff was diagnosed with stable cardiomegaly.  A carotid doppler performed in March 2009 was also normal. Tr. 13.  Given the fact that Plaintiff's borderline cardiomegaly was noted to be stable in 2009, we find substantial evidence to support the ALJ's determination that this impairment was non-severe.

The record also corroborates that Plaintiff had been diagnosed with COPD. And, it is clear from the evidence that she continued to suffer from COPD flare-ups, in spite of the medications prescribed. However, records also indicate that Plaintiff was a smoker. Initially, she was smoking three packages of cigarettes per day. Although Plaintiff did reduce her intake of cigarettes to one and a half packages per day, she did not completely quit smoking until shortly before the administrative hearing. Her doctors repeatedly advised her to quit smoking.

A review of the literature concerning COPD reveals that cigarette smoking is the leading cause of COPD. *See* National Heart Lung and Blood Institute, *What is COPD?*, *at* http://www.nhlbi.nih.gov/health/health-topics/topics/copd/ (January 12, 2012). "By far, the most important and effective treatment for COPD is stopping smoking, which results in improvement in lung function during the first year after quitting and a return to a normal rate of change in lung function thereafter." *See* Mayo Clinic, *Chronic Obstructive Pulmonary Disease*, *at* http://www.mayoclinic.org/copd/treatment.html (January 12, 2012). On the other hand, continued smoking can cause a rapid deterioration in lung condition for COPD patients. *See* National Heart Lung and Blood Institute. We note that failure to heed the advice of doctors and stop smoking when directed to do so in order to alleviate or mitigate an existing impairment is grounds for denial of benefits. *See* 20 C.F.R. § 404.1530 (1990); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *Kisling v. Chater,* 105 F.3d 1255, 1257 (8th Cir. 1997).

We also note that Plaintiff's last appointment for symptoms associated with her COPD occurred in May 2009, approximately eleven months prior to the ALJ's decision. Given the frequency of her prior treatments for COPD, it seems that Plaintiff's condition had either improved or stabilized. Accordingly, we can not say that Plaintiff's COPD was disabling. Accordingly, we can not say that her condition was disabling.

13

Plaintiff was also obese, being five feet two inches tall and weighing approximately 220 pounds. And, it is clear that her obesity contributed to her limited mobility and increased health risk. However, records indicate that doctors repeatedly advised her to lose weight, watch her diet, and exercise. Plaintiff failed to heed their advice. *See Guilliams*, 393 F.3d at 802.

Treatment notes also indicate that Plaintiff was treated for arthritis. However, doctors prescribed only conservative treatment for her arthritis. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). In fact, Plaintiff only sought out treatment for pain associated with arthritis on three occasions during the relevant time period. Tr. 389, 401, 477. She testified that her condition worsened about two years prior to administrative hearing (October 2007), although she continued to work until 2008. Tr. 37-38, 52. There is simply no medical evidence to suggest any progressive disease or deterioration of her condition at anytime relevant to the disposition of this case. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). Accordingly, we can not say that her arthritis was as limiting as alleged.

### 2. **Mental Limitations:**

Plaintiff was also treated for depression. We note, however, that her medication seemed to be effective at treating her symptoms. Plaintiff even testified at the administrative hearing that the combination of the counseling and medication helped her cope. Between June 2006 and July 2009, Plaintiff only sought out medication treatment from her primary care physician. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment). Her symptoms seemed to be linked to multiple deaths in her family and her son's military service in both Iraq and Afghanistan. She was prescribed Effexor and advised to seek out counseling for situational depression.

In early 2009, Plaintiff presented at Perspectives with complaints of irritable mood, diminished appetite, sleep disturbance, low energy, poor concentration, feelings of hopelessness, excessive worry, and short-term memory impairment. Tr. 504-505, 510. She was assessed with marginal insight; mildly low intelligence, although no actual intelligence testing was performed; and, moderate depressive disorder. However, Plaintiff was noted to be fully oriented; exhibited normal attention and concentration; exhibited intact memory; exhibited a bright and flat affect and a depressed mood; exhibited normally logical and responsive thought processes and normal thought content; and exhibited normal and intact judgment. Tr. 519-520. In June and mid-July 2009, although Plaintiff actually reported some improvement in her symptoms, she was assessed with a severe level of depression via GAF scores of 35 and 40. Dr. Witherngton even noted that her condition had improved, yet continued to rate her GAF extremely low. On July 31, 2009, Dr. Witherington again indicated that Plaintiff's depressive disorder was stable, but assessed her with a GAF of 40.

In August 2009, Robin Sanders, Plaintiff's alleged counselor, completed a mental RFC assessment indicating that Plaintiff experienced marked to moderate symptoms in many areas of functioning. Plaintiff argues that the ALJ failed to give Ms. Sanders' opinion controlling weight. She contends Ms. Sanders was a part of a treatment team at Perspectives. Ms. Sanders saw her for counseling while Dr. Witherington handled her medication management. Although the ALJ does not that Ms. Sanders was a counselor, and therefore not considered an acceptable source, the main problem with Ms. Sanders' opinion is not her credentials as a mere counselor. The problem lies in the fact that there is simply no medical evidence to support the limiting assessment she provided. The record is totally void of any counseling notes to indicate Plaintiff ever actually saw Ms. Sanders for counseling sessions, the number of sessions provided, the frequency of those sessions, and Plaintiff's level of functioning at the time of those sessions. We have only an RFC assessment from Ms. Sanders with no supporting documentation.

15

Even if we consider Ms. Sanders' opinion as a part of the treatment team at Perspectives, a second problem arises. We find Plaintiff's reported symptoms, Dr. Witherington's overall assessment of her condition (*i.e.,* improved and/or stable), and the GAF scores awarded to her to be internally inconsistent. We note that the opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000). However, because Plaintiff reported and Dr. Witherington noted improvement in Plaintiff's depression, to the point of assessing her with stable depression, all the while assessing her with lower and lower GAF scores, we find his records to be internally inconsistent and inconsistent with the overall medical records concerning Plaintiff's level of mental impairment. Accordingly, we can not give them controlling weight.

After reviewing all of the evidence documenting Plaintiff's depression and anxiety, we find substantial evidence to support the ALJ's conclusion that Plaintiff had mild restrictions with regard to activities of daily living; moderate difficulties in social functioning and concentration, persistence, and pace; and, no episodes of decompensation. Tr. 14.

### 3. **Activities of Daily Living:**

Plaintiff's own reports concerning her daily activities also undermine her claim of disability. On an adult function report dated November 6, 2008, Plaintiff reported the ability to care for her pets, care for her own personal hygiene, prepare simple meals daily, do the laundry, wash dishes, clean the bathroom, drive a car, go outside once per week, shop in stores for groceries and household items, pay bills, count change, handle a savings account, use a checkbook/money orders, read, watch television, and talk to her friends on the phone. Tr. 100-203. She also stated that she could follow written and oral instructions, get along well with authority figures, and handle changes in routine. Tr. 204. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes

16

go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Further, Plaintiff also worked until 2008. Tr. 37-38. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir.2005); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir.2001).

### B.     The ALJ's RFC Assessment:

We next examine the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or his RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of the non-examining, consultative doctors. On December 15, 2008, Dr.

Ronald Crow completed a physical RFC assessment. Tr. 408-414. After reviewing her medical records, he concluded that her physical impairments were non-severe. Tr. 408-414.

On March 4, 2009, Dr. Jim Takach completed a physical RFC assessment. Tr. 433-440, 441-448. He, too, reviewed Plaintiff's medical records and concluded Plaintiff could perform light work involving occasional climbing, balancing, stooping, kneeling, crouching, and crawling and no concentrated exposure to extreme cold or heat, fumes and odors, or hazards. Tr. 441-448.

As discussed above, the evidence does reveal that Plaintiff was diagnosed with borderline cardiomegaly, COPD, arthritis, obesity, and depression. By the time of the ALJ's decision in this case, both Plaintiff's cardiomegaly had been assessed as stable. Further, it had been approximately eleven months since Plaintiff's last treatment for COPD, at which time she was prescribed Symbicort. At the hearing, Plaintiff did testify that she had stopped smoking just prior to the hearing, after a five month battle with quitting. Accordingly, it seems clear to the undersigned that her lung condition may have actually improved. At any rate, an eleven month lapse in the need for treatment is at least some evidence that her condition had stabilized.

Plaintiff's depression had also stabilized on medication. And, we note that Plaintiff reported the ability to shop in stores, handle her own finances, drive a care, talk on the telephone, watch television, read, get along with authority figures, and handle changes in routine. Although we do agree that Plaintiff would likely experience difficulty working with the general public, we find these activities to be inconsistent with a finding of total disability. Substantial evidence supports the ALJ's determination that Plaintiff maintained the residual functional capacity ("RFC") to perform unskilled light work involving limited interaction with others; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and, no concentrated exposure to temperature, humidity, and airborne irritants.

### C.     Vocational Expert's Testimony:

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified that a person of plaintiff's age, education, and work background with the above RFC, could still perform work as a sorters, hand inspector/packager, and inspectors. Tr. 63. As the hypothetical questions posed to the expert contained the impairments the ALJ found to be supported by the record, we find substantial evidence to support the ALJ's determination that plaintiff could perform these jobs.

### V.     Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 17th day of January 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE